First case of the afternoon, Sharp v. Board of Trustees of the Employee's Retirement System. For the Appellant, Mr. Berlow. For the Appellee, Mr. Draper. This is 413-0125. You may proceed. Thank you, Your Honors, and may it please the Court. My name is Cliff Berlow. I'm an Illinois Assistant Attorney General, and I'm here on behalf of the Board of Trustees of the State Employee's Retirement System. While the fundamental question presented in this case is one of statutory interpretation, I want to at least begin my presentation by trying to address the Court's factual question in its November 25th letter to counsel. And what the Court essentially asks is whether the revised calculation of pension included both Mr. Sharp's IMRF pension as well as his Sears pension. And the answer is that it does not. It does not what? It does not include both pensions, the revised calculation. And if I can just briefly, because I think it's critical that we have these facts be properly understood to really get into the meat of the statutory question. If you look at page C-115 of the record, which is the first estimate, you will see that the bottom line number is that Mr. Sharp was estimated to receive $2,970, with Sears providing $2,439 of that amount, and IMRF being estimated to provide the balance. If you look at the second estimate letter from July 2010, which appears at C-119 of the record, it's very similar. The bottom line number is $2,897, Sears providing $2,371, and IMRF providing $526. Now, the awards that are at issue, not one of them includes the IMRF pension. That was applied for, I assume applied for separately by Mr. Sharp and awarded separately by IMRF. So he is, in addition to the Sears awards, receiving an IMRF pension of somewhere in the order of $550. And so, if you look at the incorrect award that we're seeking to correct here, that would require Sears, and Sears alone, not IMRF, to provide Mr. Sharp $3,148 per month. And what we are trying to correct it to is to provide Mr. Sharp $2,496 per month. And what I would call the Court's attention to here is that the outlier here is the erroneous award. The outlier here would have Sears playing more than $3,100 per month, whereas both of the estimates would have Mr. Sharp receiving approximately $2,400 per month. And the same is true of his revised award. Indeed, his revised award would actually be higher than either of the estimated awards, either of the awards he would receive under his estimate. And so, we stand by our position that Mr. Sharp is, under the erroneous award that we're seeking to correct, is receiving money to which he is not entitled to under the statute, and that is well in excess of what is permissible under Illinois law. Now, fundamentally, of course, as I said at the outset, this is an issue of statutory interpretation. And so, the question presented to this Court is whether or not the General Assembly granted the Board the authority to correct, whether you want to call it an arithmetic error, a computational error, I think it all falls within the general umbrella of a Scrivener's error, whether the General Assembly wanted to allow the Board to correct such errors, or whether it was its intent to allow those awards to go unaddressed and be essentially irrevocable. And the answer to that question, and we certainly take no umbrage with the proposition that the General Assembly has to give the Board the authority to correct errors. Indeed, that is certainly true as a matter of Illinois law and seems beyond reasonable dispute. But, it is not the case, as Mr. Sharp appears to believe, that it must be an explicit grant of authority. It is indeed perfectly reasonable for the General Assembly to grant an administrative agency the authority to correct what are generally Scrivener's errors through an implicit grant of power. And an implicit grant, the implied powers doctrine, indeed would be entirely unsettled if it were the case that it was impossible to create a statute which would implicitly grant the power to correct errors to an administrative agency. If, for example, the General Assembly said that the Board shall never make a mathematical mistake and shall never issue an award that includes a mathematical mistake, certainly it would be implicit in that, that if a mathematical mistake were discovered down the road, that they would expect that that mathematical mistake would not be perpetuated. And here we have at least three, which we believe are individually sufficient, but three express provisions of Article 14 of the Pension Code, which we believe, either separately or in the aggregate, imply that the General Assembly wanted these sorts of Scrivener's errors to be corrected and not allowed to deplete the fund. Well, if that's the case, why did the General Assembly specifically provide for the sort of correction you're saying is implicit here in the State University's retirement system and the municipal police pension boards? Justice Steigman, I think the answer to your question is that the Sears Article 14 of the Pension Code was drafted in 1963, whereas all of these error correction provisions were added to the Pension Code in the 1990s or the 2000s. Well, how does that explain their omission? If after all, it was an older statute, and in 1990 or 93 or whenever it was, these correction provisions were included, why not include it here? Well, Justice Steigman, I think it's a fundamental canon of statutory construction that we're trying to determine what the intent of the legislature was that enacted the relevant statute. And it's difficult to see, and I think it's also pretty fundamental that we don't look to subsequent laws that were not passed by subsequent legislatures. As a way of gaining insight into what was intended by a prior legislature. Well, you mean the authority to correct the mistake provision was put in Sears later? It was put in Sears in the late 1990s or early 2000s, yes, that's correct. Then why wasn't it put in other Pension Code provisions? Well, I think the answer to that question has to do with the way the General Assembly addressed the various articles of the Pension Code individually rather than holistically. And I think it reflected individual amendments being proposed. But again, I don't think that we look to later bodies of the legislative branch to determine what the original branch, what the original legislature intended. Do you have a case that says that? I think I can certainly, I didn't cite one in my brief,  but I think that's a fundamental principle of statutory construction. Justice Scalia has written about it, particularly in the context of the Constitution, and other jurists have described it in the context of... Well, this is a matter of legislative intent, this is not constitutional interpretation. No, but that principle has been borrowed. Well, what I understand is this also. This isn't the little old lady running the corner candy store. These are pension funds involving millions, tens of millions, hundreds of millions of dollars. Don't they have lawyers? Don't they have staff? Aren't you guys the lawyers for them if they don't have their own and get advice? And how is it you want us to believe the legislation is going to address these, the correction provision in some pension programs, but not in Sears, SERS, and this huge program involving millions of bucks, and why isn't the burden on someone from them or your office to say, by the way, you know, we carefully follow legislation affecting pensions. There's this correction provision so that if a mistake is made, you can come out and fix it. We need one of those, too. Justice Steigman, I think it's always true that legislation can, in theory, be more explicit. They're not more explicit. There's nothing. It's not as if they drafted a bill to achieve this goal and didn't quite say it right. There's nothing to achieve this goal ever before us, is there? Justice Steigman, our view is that while it may not be explicit, it's certainly implicit by making the board a fiduciary, requiring it to administer the fund exactly as required in the code, and by asking that they conduct audits periodically. Doesn't it fail its fiduciary duty by not doing this within 35 days, as would be required under Mr. Draper's theory? I apologize. But I think the answer to that question is that it would fail its fiduciary duty if it didn't act when it learned of the mistake. Would it fail its fiduciary duty not to recommend to the legislature that this, whether it was an oversight or it reflected intent at the time, or whether it just needs to be done for clarity's sake, make us like these other courts? Well, Justice Kinect, if this court were to hold that they lack the statutory authority that they need, then I think it may not fail its fiduciary obligation, but it would certainly be wise for the board to seek that statutory power. But again, the question here is whether the existing statute implies this authority, not whether it could be said better. And so I still come back to the fundamental question, which is, is it conceivable that the General Assembly in 1963, when they made the board a fiduciary, said, you are to act as a fiduciary of the fund, but you cannot take steps to protect the fund from invasion by an erroneous calculation? You're going to take whatever steps you want. You just have to do it within a timeline. Well, Justice Kinect, I think it's difficult to take a step when you're unaware of the problem. I mean, part of this points to the difficulty of a non-adversarial process. How many people are part of the service system? Justice Steinman, I don't have the figure in front of me. Tens of thousands? Tens of thousands, I think, is a fair estimate. So it's an unforeseeable problem that they might make a mistake calculating the retirement benefits for any of these people and catch it within 35 days. Is that what you're asking us to believe? No, Justice Steinman. What I'm asking the Court to believe is that the General Assembly in 1963, as it did with every other article of the Pension Code, believed that it was sufficient to say, we want you to carry out a certain set of duties and responsibilities. And in order to do that, they legislated against the backdrop of the implied powers doctrine. And that implicit within that is the expectation that a Scrivener's error would be corrected. If, for instance, a clerk had permitted the decimal point for Mr. Sharpe's award, instead of receiving $2,400 plus a month, he was receiving $243,000 a month. It is utterly inconceivable that the General Assembly would have said, no, what we want here is for the state to provide over the next 20 years more than $2 million to that individual. There is nothing between the omission of the decimal point and the error that's here because Mr. Sharpe has never disputed that he is receiving money to which he is not entitled. He's never made an argument that his pension is properly calculated. His only argument is that there is not a thing that anyone can do about it. And I would call the Court's attention to what I think are the central case law, the central dispute regarding the case law in this case. On the one hand, you have Sola and Rossler, which Mr. Sharpe relies upon, and more recently the Crazen case from the Illinois Supreme Court and the lower court decision here. And on the other hand, O'Grady and Giersch. I think that there's a very clear dividing line that you can see between those cases. Sola and Rossler involved an administrative agency that was trying to change their interpretation of a statute and then calling that an error and using that to retroactively change the administrative judgment. O'Grady and Giersch involved genuine mistakes of facts, genuine clerical errors, a misunderstanding in Giersch that an individual met the educational requirements under the Act. And O'Grady, the belief that these individuals had qualified under the specific statutory standards for merit protection. Those are mistakes of fact, those are clerical administrative errors, and the error in this case, because it is not disputed that there is any reasonable interpretation of the statute, is exactly like those sorts of mistakes. Indeed, for Mr. Sharpe to make an argument that the statute could be fairly interpreted to support his award, he would be doing so before the Court for the very first time today. And so, again, I think the fundamental issue here is not whether or not the legislature in 1963 could have been more explicit. And it is certainly not whether in the 1990s or 2000 a subsequent legislature could have been more explicit and included SERS within its amendments. But I think the fundamental question here is whether or not the powers that were granted were sufficient to imply that erroneous Scrivener's errors, using that general term, would be able to be addressed by the agency, even after the fact. It strains credulity, I think, to suggest that what the General Assembly wanted is for a fund to be completely depleted by excess payments over a long period of time based upon a clerical mistake. And, indeed, Chief Justice Warren in the American Trucking case thought it absurd that one could not imply from the duty to carry out your statutory responsibility to administer a statute that you could not correct a clear, plain, uncontested, undisputed mistake. At any time, whether it's a year, five years, ten years? Justice Turner, I think the longer this goes, the more credible an equitable estoppel argument might be. At some point, I suspect, an individual could show such undue hardship that perhaps they could get estoppel against the government. But I don't think Mr. Sharp has made that showing here. In the first instance, I think he can't establish reliance here, because he was never told he would receive the erroneous multiplier when he made the decision to retire. And he claims that his act of reliance was retired. In the second level, I don't think there's been any showing here, anyway, of some sort of manifest injustice that will result, either in him being forced to pay the money back the restitutionary relief we're seeking, or by prospectively getting only that award to which he's statutorily entitled. But I think someone ten years, twenty years down the road who had made a showing in a record of having made certain financial decisions, if it was a choice between declaring bankruptcy or having their award reduced, I think that individual may well have a very strong case for equitable estoppel in that circumstance. But I don't think that that has any bearing on the fundamental statutory question here. And I think the factual questions in this case don't really lend themselves well to that sort of an argument. Certainly, Mr. Sharp could have made a showing in the administrative agency that he was somehow significantly burdened if his award were reduced. He could have made an offer of proof in the circuit court. He made none of those things, and he's made none of those showings. And I don't understand... So, if he makes an argument that he needs the money, somehow that changes this case that involves statutory interpretation? If he could show it to the degree required to satisfy the standard for equitable estoppel, Justice Connect, I think that we would probably concede that he would be able to successfully invoke that. Certainly, that's what happened in the Roster case, where an individual was told one thing in 1994, and then some 15 years later, someone comes along and says, no, we've changed our mind. Now, that involved a change in statutory interpretation, which I think we would concede is outside the scope of the very modest power we're seeking to invoke here. I mean, we're talking about the modest power to collect correct, clear, obvious, Scrivener's errors, arithmetic errors, that general concept. So, I don't know... So, what does the 35-day period of review apply to, then, if not these circumstances? Well, Justice Turner, the 35-day period of review comes from the administrative review law. And so, it seems to me that you have the specific statute here, which is Article 14 of the Pension Code. And if it allows for the ability to revisit an error, then that specific provision would trump the more general statutory provision. I mean, the Administrative Review Code is a statute just like the Pension Code is. So, I don't think it has any sort of constitutional sort of significance that we would not be able to... I think our argument, in essence, is the Pension Code abrogates the Administrative Review Law in that respect. The 35-day review period, I think, would apply to anything that doesn't qualify as a Scrivener's error or as an error induced by misrepresentation or fraud. I mean, Mr. Sharpe has never made the argument that somehow, if he had broken into the Sears in the dark of night, changed his records, and received an erroneous award as a result, that there's any difference between a fraudulent error and an ordinary Scrivener's error or an error that's a product of negligent misrepresentation. Again, we believe this is a very modest power that the Board is claiming to have. And it's one that's been recognized. And the only two cases we believe are truly on point here should know great. If I may, I just want to briefly turn, if I can, to the cross-appeal issue. And I'm happy to take that up on reply to a greater extent if there's any questions. But what I want to focus on is the issue regarding the Bystanders Report. And I want to distinguish between two different sorts of claims. One, a Bystanders Report was not created here. And another, that the rule allowing for a Bystanders Report is invalid as a matter of law. The remedy for an improperly created Bystanders Report, or the lack of one, would be remand to the agency for it to perform its function, if I may just briefly finish this thought, for it to conduct the proceedings as required by its own rules. The second claim is that the Bystanders Report does not require the rule for being struck down. Mr. Sharp's arguments appear geared towards the former, but he is asserting the latter relief, and we think that's fundamentally misguided. Thank you. Mr. Draper. Thank you. May it please the Court, Counsel, Mr. Berlo. The argument that you just heard really shines a spotlight on the plight of a citizen dealing with the state agency here, a retiree, facing a never-ending denial that the agency has acted beyond its statutory power. And it's an unusual case that an individual is able to mount such a challenge and confront an agency that exceeds its power in such a gross way as this record reveals. And when that happens, that addresses the reasons why the Administrative Procedure Act specifically required the proper adoption of rules and prohibit enforcement of policies that meet the definition of rules and are never promulgated. Now let me get to the Court's first two questions, and let me start with the question on the recalculation. The question posed by the Court is whether this recalculation includes both SERS money and IMRF money. And despite Counsel's statements about where in the record you might be at yourself, two things. At the administrative hearing, SERS offered no exhibits. The documents in SERS's file that are referred to were not part of that administrative decision. Just simply not part of it, and not something then that Mr. Sharp could have confronted then nor on administrative review. Secondly, there is nothing in the decision that SERS issued stating that. There is no support in the record for the claim that the figure now being used is $24.96.85. In fact, it is only an SERS portion. And the reason that we are stuck with not knowing the answer relates to the Administrative Procedure Act violations that no record was kept of the hearing whatsoever. Now let me address Counsel's last assertion that Mr. Sharp's claim is about a bystander's report. It's not. It's not. And very clearly what he filed in the Circuit Court and what he briefed was SERS has a set of rules governing its hearings that expressly prohibit a recording for a stenographer. It prohibits having a verbatim record that the APA mandates be done. And then says that they will instead produce a bystander's report and of course in Mr. Sharp's brief we did point out that even as to that But if the APA requires a record, how can the rules prohibit it? The rule cannot prohibit it because the rule is invalid. The APA mandates and it's a statute. Rules cannot trump the statutory authority. They have to be developed within it. And the APA was adopted under the Pension Code as governing its process for the APA governing how administrative hearings will be conducted. It expressly requires that a record be made so that a verbatim transcript of testimony can be preserved. And this rule just completely abrogates it. Was this discussed at the time of the hearing? It was discussed at the hearing and it was discussed in the submissions that we provided. Let me back up. I didn't raise it at the hearing because I did my research afterwards when we got the decision. And so we raised it I believe first time on administrative review. I want to stand corrected on that. I didn't give them advance notice. We did raise the lack of statutory authority, the Rossler and Sola decisions in written submissions to the agency. But it's not possible for this court to accept the answer that was given. There is no record that supports that. And that is one of the problems that Mr. Sharp faces. But the only written document he got was that his pension was being reduced from the $3171 in change down to $2496. That's what the written letter was that he got and that's what he challenged and asked for an administrative hearing. Now the second question that the court asked was very important because if the court, as the circuit court did, simply addresses the statutory authority and finds there is none, doesn't that often end the need for further analysis? And in this case, no. Mr. Sharp has a right under the administrative review law to challenge all parts of the administrative decision that he confronted. And let's look again at what had to happen. Mr. Sharp receives this unilaterally issued letter about nine months after his initial pension award was determined by an administrative process. It's all on paper, but it's an administrative hearing process. He receives this and has the burden to challenge it. And he does so. And as he challenges it, he challenges the lawful authority to engage in this activity in the first place. It's fundamental to his claim. And he has a right under the administrative review law to have all of the questions raised by the record reviewed. And it's crucial that it be done because in a situation like this, SERS has acted without any statutory authority to make this change in an administrative decision that was final, as the Administrative Procedure Act and the Administrative Review Law provide. And to unilaterally change it in a way that it would never do for a citizen affected by Nerone's decision that went the other direction. He had to challenge that and he finds this policy that there's an assumption of an implied power. It's all written out in the recommended decision that the board adopted. That they have such an implied power. The suggestion in that decision that it's used or regularly would be used in other cases. The Administrative Procedure Act defines that as a rule and mandates that if there's some kind of discretion or an assumption of some implied power, that there be rules outlining the boundaries of the exercise of such a rule. If there's going to be a policy about recalculating benefits after a final administrative decision is issued, then there must be some kind of rules to curb when it's going to happen. Can it happen 20 years out? In fact, one of the other statutory amendments specifically says no and places strict time limits to make sure that there's not a tremendous burden placed on someone who maybe has in fact received overpayments. How does it make a difference what the procedure is if the court were to decide, as the circuit court did, that you don't have the Two things on that. The fact that SERS claims to exercise this implied power is in fact an invalid rule. So when the court rules you have no such power, the court is in fact dealing with that question of is this policy one that can be enforced. Because of that, SERS should receive a ruling from the court telling it your policy is a rule that's not been promulgated, it's invalid. And that's the teaching of the Supreme Court. But if it were promulgated, it would be invalid. Of course it would be invalid and would still be under challenge. It's going to be invalid either way, but no such court has told it that it has to do this and we don't know how many other cases maybe have gone down this path without challenge. Now that's not a basis for this court's ruling, but in this case David Sharp saw the error in it and addressed it and has a right to a ruling on it. And then the second thing is the only way he even got a chance to get to court was through the administrative review law process. And he faced there the same problem of what is this miscalculation? How did it come around? There's constant claims that this is a Scrivner's error. There's nothing in the record to support that. Nothing whatsoever. Look at the process that's used. And it's all written out again in the written final decision that the board adopted where counsel for SERS wrote that staff review this and submit a report to an executive committee. The executive committee is charged with reviewing it, adopting a motion to put it on the board agenda for final approval. And then the board conducts a final approval of that. Nobody made a math error or a Scrivner's error. If there is an error, it's a question of the legal application of law of which formula Mr. Sharp is entitled to. We still can't tell because SERS didn't put on evidence during the hearing. SERS didn't submit any exhibits. SERS didn't submit any calculations even though it initiated this process. What did it present? It presented nothing. It said, and this is typical of the hearings, and I'll depart from the record a second because I have done other hearings like this, it's a very user-friendly, if you will, kind of hearing because the executive committee sits around and listens to what you have to say, but never in my experience has the board offered any exhibits or had anyone testify. They certainly did not in this case. And so that's why you can't find that it's the kind of Scrivner's error that's even being challenged here. So your argument is this is not a Scrivner's error, correct? That's correct. And if it was a Scrivner's error, what would your argument be? It still has no power because at the end of the day at the end of the administrative process David Sharp receives a letter saying your benefit has been calculated and it's going to be $3,117 and change. And if you disagree with this, this is a final administrative decision and you can appeal it within 35 days. Okay, I get that. Mr. Berlow argued what if there had been an error with the decimal point resulting in just an outrageous amount clearly beyond what the recipient was entitled to in pension benefits. SCRS has no right to try to make that right, to try to correct that. Let's look at the statutory power that was argued as the basis for correcting that. And that also dealt with the fact that two other retirement systems have a legislative correction. I understand that, but does that really Let me tie it together for you. I'm trying to do that. Looking at all of that together here's what the General Assembly did in its enactment for SCRS. It said you shall have an administrative hearing process to make a determination. And that process was fairly thorough. Staff review, executive committee review, opportunity to comment on it at that point, and then a decision by the board that's a final administrative decision. And I dare say that if Mr. Sharp got an erroneous calculation and on day 36 ran to court and tried to file a complaint for administrative review, he'd be met with a tremendous amount of case law starting with Winston v. Superior County zoning. All of the decisions that administrative review is a statutory power for the courts. If you it's a final decision. Is it erroneous? I don't know. I can't tell from this record. Back to my question. Let me say if the decimal point went the other way and it was $3 instead of $300,000. He'd be out. So no matter how egregious the error, SCRS is just out of luck. Don't do a review within 35 days. You know, there's only so many opportunities for a hearing or trial or determination. I'm not saying you're wrong. I just want to make sure that I understand your position. And I'm going to absolutely directly answer that. Yeah, SCRS is not able to do it. And your argument would be the same thing would apply to your client as Justice Connect has indicated if the decimal point was the other way around. Working as I do with citizens and challenging state agencies, that kind of thing does happen. And as this court knows, when it comes to trials, whether they be even criminal cases with constitutional law questions, there are only so many opportunities that our judicial system gives for further review. SCRS had three chances to get it right. And SCRS has a rule that says for newly discovered evidence, you can reopen a case within 90 days. So they even have an outlet here to use their own hearing procedure rules to have reopened the case upon discovering something new. Now it would require something new. I don't know if that would have applied. We would have defended. But look, they have a rule. They've already thought about the need to reconsider. And they chose how to draft the rule. Not the General Assembly. And they drafted it with a 90-day time limit. And this is nearly nine months, not 90 days, after the fact. How many members are there in the SCRS system? I would agree with tens of thousands. Maybe we'll hear a statistic with the challenges that are going to happen. The reason I ask is we sometimes hear these horror stories from the government, usually the federal government, about how they're sending tens of thousands of dollars in income tax returns to people sitting in Menard prison or whatever. Doing all kinds of other crazy stuff to say, how is this possible? And I guess one of the ways to look at it is bureaucrats dealing with large numbers of people. What if Mr. Sharpe's pension were $38,000 a month instead of three? Then again, after three steps and then the opportunity 90 days to reconsider, when does it end? Because if there's no ruling by this court that this is a policy that's an illegal rule and declared invalid, there is nothing to stop SCRS from doing this time after time after time or waiting 10, 20 years. And we're talking about hundreds of thousands of dollars for a system that has billions. If this was CSRS instead of Sears, there'd be no problem with it. If this were the university system and if it were an arithmetic error, I don't know that this still would qualify, but maybe it would. And that system has other safeguards to make sure that the use of this is still curbed. And that's what's also wrong about this. It's a rule relying on an implied power argument never properly defined. And that's why it's an illegal rule. And that's what Mr. Sharpe really is asking for fundamentally in this case, is to get that determination correctly made. Can and should SCRS seek some appropriate legislative authority for this? Sure. And should those rules have something to balance these equitable interests? SCRS is claiming that they're the victims of an inequity that they initiated and try to place the entire burden on Mr. Sharpe who has no opportunity to go back to work and earn the additional law enforcement service credits that he needs. He's about a year, year and a half short. You heard Mr. Berlow's arguments about how the difference of when these various pension board enactments occurred. Yes. And how the one occurred earlier and the thought, if I understand his argument correctly, it's arguing that the legislature and the board would think there were these implied powers to do what's done here, whereas later on when these other pensions boards were addressed, like CSRS and the police pension board, that was different. What are your thoughts? There's an easy answer to that. Rossler was decided in 1989. Perhaps that was the impetus for the police pension boards to seek their legislative change. SUR, SCRS had since 1989, I mean they've got legislative staff like every state agency do. And lawyers on the staff and everything? Lots of that kind of thing. All state agencies do. I think we can take that. SOR was decided in 2003 and this clearly is a case that proceeds through an administrative determination. So how much more notice do they need that they don't have this power and that they certainly can't exercise it more than 35 days after their final administrative decisions? If there's any equity to be looked at, it's certainly not that Mr. Sharp is taking advantage of the retirement system. It's the other way around because if they're arguing inequity, where is the equity of changing the pension and not allowing Mr. Sharp then to realize I need more service credits, let me go back to work and earn them. And when you're dealing with equitable principles, you've got to put the parties back to the point where that dispute happened in order for equity to be given. This isn't, however, equity. And in all my years of dealing with administrative law, we deal with the harsh realities that the administrative review law under our Constitution provides a statutory system that has to be strictly followed. And this is the first time I've seen a state agency asking the court, in essence, to excuse its failure to comply with that law when ordinarily that's what's applied to citizens in the state. We'd ask you to reverse that part of the decision, not addressing the invalidity of the rules and remand it for further proceedings. Thank you. Let me begin with Mr. Draper's argument that there's nothing in the record that would allow us to know that there are two pensions and that Mr. Sharp is separately receiving a second check. On page C-195 of the retirement fund, it spells out that there are two checks going to Mr. Sharp. It provides that Mr. Sharp is currently receiving $559.94 from IMRF and that he is supposed to be receiving $2,416.16 from Sears. I also want to come back to your question, Justice Steigman, about what was in the record here. Mr. Sharp received in both his estimates, but most importantly in the award notices, a worksheet that breaks out exactly how the math works. He was free to look at those worksheets. They provide all of the information anyone could need about how the bottom line number was reached and he could challenge it or make the argument that the sheet attached to what we've called the erroneous award is actually correct and he's chosen not to do that. In addition, the argument that this is not a Scrivener's error, there's no evidence of that. What we have on the record is that the Board said this is a Scrivener's error. Mr. Sharp responded to that with stony silence. He made no argument and no effort to rebut that. Other than the assertion it's a Scrivener's error, did you present any evidence or testimony or anything to support that claim? We didn't have the burden if he wasn't going to contest the representation. His only argument was that there's no statutory authority to do it even if it is a Scrivener's error. So it's a little late in the game to come along. Speaking about the hearing, what about his absence of record and his argument that your rule is contrary to the statute? Well, the rule regarding the use of a bystander's report is consistent with the statute. What the statute says is that oral proceedings or any part thereof shall be recorded stenographically or by other means that will adequately ensure the preservation of the testimony or oral proceedings. What was the prohibition he referred to? Pardon me? The prohibition? I thought Mr. Draper said there was some rule in your agency that prohibited... I apologize, we have a rule which says that we shall make bystander's reports rather than full transcripts. If a bystander's report is good enough for a full criminal trial, I should certainly think it is adequate to adequately preserve the record in an administrative hearing. Is there a recording of the hearing? No, there isn't. Why is that? Because it's not the practice of the board and they've made the decision that they comply with the requirements... No, bystander's record and recording are not inconsistent. It's not inconsistent. Recording might be the basis for the bystander's record. You could certainly do that, but the question is whether the APA requires it. And I think the answer to that question is no. If the APA doesn't require it, then the rule doesn't violate the APA and the rule does not come down. With respect to... Would it be a violation of this court's rules if I showed up with a tape recorder? Probably not with a stenographer, I would think. A short-hand court reporter. I would certainly think that an individual cannot come in and create their own record that is contrary to the rules of the agency. Now, if this court decides that the APA requires a recording, it certainly would be the first time that any court in this state has done so. I want to also address his second APA argument, if I can. His argument is that the board has a policy that is undeclared and a secret policy, in essence, of correcting Scrivner's errors. Even the Coffman-Drain decision, which is the foundation of this argument, recognizes that it is perfectly appropriate for an agency to interpret its own statutes and announce those interpretations through adjudicated cases. And it is perfectly appropriate, therefore, for the board to explain that it has error correction authority through an adjudication that involves a Scrivner's error. And what Coffman-Drain certainly doesn't... Coffman-Drain involved a claim of prejudice because no one could possibly know that the Department of Agriculture in that case handled disputes over the quality of grain. No one can plead surprise that the board administers the pension fund and does so in accordance with the statute. The last point I want to make here is, if I may briefly sum up, is that Mr. Sharp has made the argument that there is an inequity here because he would be precluded from challenging this decision after 35 days, but the board would not. No one has made the argument that the board, as a fiduciary not just to the fund, but to all the beneficiaries, would have an obligation to correct an erroneous pension award no matter what its nature. Indeed... So it's a decimal point. We're off to allow only $3 a month as Justice Connett suggested. So the 3,000-year argument would be that you could correct that and would correct that? I certainly think we could correct it. The individual retiree could not file an action that would compel the board to correct it, but it may well have statutory obligation to do so, and the Attorney General's office may well have power to compel an agency to bring itself in compliance... So if they made this claim 36 days after the final decision, beyond the 35-day deadline, SCRS would not take the position that you're too late? It would be too late to file an action for administrative review, but SCRS would have the authority to correct the error just as it would if the decimal point was off the other way, and indeed it has the obligation to get things right. What I guess I'd close with on this point is that there is a position, contrary to the statute, that the board here has acted in a way it is not authorized to under the statute. Mr. Sharpe's position is that the agency is prohibited by the statute from bringing itself into compliance with the statute. That seems to me to be a strange position. Thank you. I take the matter under advisement.